**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IJKG OPCO LLC, d/b/a CAREPOINT HEALTH–BAYONNE MEDICAL CENTER, | Civ. No. 17-6131 (KM) (JBC) |
| Plaintiff, | **OPINION** |
| v. | |
| GENERAL TRADING COMPANY, CONSOLIDATED HEALTH PLANS INC., CIGNA CORPORATION, INC., ZELIS HEALTHCARE, INC. a/k/a PREMIER HEALTH EXCHANGE, INC., FIRST CHOICE INSURANCE SERVICES, L.L.C., and STANDARD SECURITY LIFE INSURANCE COMPANY OF NEW YORK, | |
| Defendants. | |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, IJKG Opco LLC, doing business as CarePoint Health–Bayonne Medical Center ("BMC"), brings suit to recover the costs of medical care it provided to a patient who experienced severe renal complications and was hospitalized for about three weeks. Defendants are General Trading Company ("General Trading"), which provided the patient's employee welfare benefits plan; Cigna Corporation Inc. ("Cigna"), which was the claims administrator for the plan; Consolidated Health Plans, Inc. ("CHP"), which, along with Cigna, jointly administered the plan and was the third-party administrator for the plan; Zelis Healthcare, Inc. ("Zelis"), also known as Premier Health Exchange, Inc. or PHX, which was the claims contract negotiator; and Standard Security Life Insurance Company of New York ("SS

1

Life"), which provided General Trading with a stop-loss policy that insured losses in excess of a deductible arising from specific plan beneficiaries. Several defendants have brought motions to dismiss and for judgment on the pleadings.[1] For the reasons outlined below, I will grant SS Life's motion to dismiss, deny General Trading's motion to dismiss, and deny Zelis's motion for judgment on the pleadings.

## I.     Summary of Facts[2]

BMC operates a fully-accredited, 278-bed hospital in Bayonne, New Jersey, which provides health care services to more than 70,000 patients annually. (AC ¶¶ 1, 22.) On November 2, 2013, "Patient 1",[3] who is insured by General Trading, entered BMC's emergency department and, after testing, showed abnormally elevated levels of creatine and potassium. (*Id.* ¶ 21.) She was diagnosed with acute renal failure and received medical treatment from BMC from her admission to the hospital until November 24, 2013. (*Id.*) This inpatient care, which lasted for 22 days, included testing to determine the progress of Patient 1's kidney disease, treatment to stabilize the abnormal levels of blood urea nitrogen and creatine, treatment for Goodpasture Syndrome, which was a result of the kidney failure, plasmaphereisis, hemodialysis, as well as other care. (*Id.*)

Patient 1 incurred a charge of $771,191.58 for the treatment of her kidney disease and her nearly stay at BMC. (*Id.*) General Trading, whose employee welfare benefits plan provides coverage for "in-network benefits" for "preferred providers" and for "out-of-network benefits" for "nonpreferred

---

[1]     Additionally, CHP and CIGNA have brought motions to dismiss (ECF nos. 104, 105), which were not fully briefed at the time of this opinion. They will be decided separately.

[2]     For the purposes of these motions, I will assume the facts alleged in the Amended Complaint to be true. The Amended Complaint (ECF no. 51), which is cited repeatedly, will be abbreviated as "AC."

[3]     In the pleadings and the motion papers, the patient at issue is referred to as "Patient 1." (*See, e.g.*, AC ¶ 20.) She is the only patient whose medical care costs BMC sues to recover in this case.

providers," has reimbursed BMC, an "out-of-network" provider, for only $175,358.05. (*Id.* ¶ 27.) CHP, General Trading's claim processor, issued an explanation of benefits on January 29, 2014, which provided reasons for disallowed charges. (*Id.* ¶ 28.) The majority of disallowances were labelled as "discount . . . negotiated through Premier Healthcare Exchange" or "[e]xceeds reasonable and customary charge." (*Id.*)

On November 26, 2014, BMC received a letter from PHX stating that "[t]he Payor has forwarded your letter for additional payment dated November 7, 2014 for our review and consideration" and that the bill would be reimbursed in the amount of $175,358.05. (*Id.* ¶ 29.) On November 28, 2014, BMC filed an appeal with CHP. (*Id.* ¶ 30.) CHP denied the appeal in its entirety and directed BMC to balance-bill the patient for the outstanding amount. (*Id.*)

On January 13, 2015, BMC filed a second-level appeal within CHP. (*Id.* ¶ 31.) On February 9, 2015, BMC and CHP discussed the status of the appeal in a telephone call, in which a CHP representative advised BMC that appeals had to be filed directly with PHX. (*Id.*) The representative also explained that the claim was paid by CHP based on the out-of-network coverage provided by Cigna and that no further payment would be made. (*Id.*) On February 23, 2015, BMC received a letter from CHP that stated "[b]ased on the Plan benefits and policy language it has been determined that the above listed claim was paid appropriately and no additional payment shall be made." (*Id.* ¶ 32.) According to BMC, this letter effectively signaled the exhaustion of its appeals process. (*Id.* ¶ 37.)

BMC sues to recover the unreimbursed balance of its bill, in the amount of $595,833.53. It claims that defendants General Trading and Cigna have violated § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, (AC ¶¶ 47–61); that all defendants (except SS Life) have acted as fiduciaries to the employee welfare benefits plan that cover the patient and breached their fiduciary duties under § 502, (AC ¶¶ 62–73), that all defendants (except SS Life) denied BMC a full and fair review of

their claim as mandated by § 503 of ERISA (AC ¶¶ 74–79); and that SS Life breached its contractual obligations to BMC, as a purported third-party beneficiary to the stop-loss policy. (AC ¶¶ 80–86.) Several motions are now before the court. SS Life has moved to dismiss the breach-of-contract claims against it (ECF no. 63.), while General Trading has also moved to dismiss the claims under ERISA against it. (ECF no. 69.) In addition, Zelis has moved for judgment on the pleadings. (ECF no. 91.)

## II.   Discussion

### a.  Standard of Review

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendants, as the moving parties, bear the burden of showing that no claim has been stated. *Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Fed. R. Civ. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 16 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he

plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

A Rule 12(c) motion for judgment on the pleadings is often indistinguishable from a motion to dismiss, except that it is made after the filing of a responsive pleading. Fed. R. Civ. P. 12(h)(2) "provides that a defense of failure to state a claim upon which relief can be granted may also be made by a motion for judgment on the pleadings." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 426, 428 (3d Cir. 1991)). Accordingly, when a Rule 12(c) motion asserts that the complaint fails to state a claim, the familiar Rule 12(b)(6) standard applies. *Id.* (making due allowance, of course, for any factual allegations that are admitted in the responsive pleading). Thus, the moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

I am permitted to consider "extraneous documents that are referred to in the complaint or documents on which the claims in the complaint are based" without converting this motion into one for summary judgment. *Morano v. BMW of N. Am., LLC*, 928 F. Supp.2d 826, 830 (D.N.J. 2013) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1996 (3d Cir. 1993)).

### b. Motion to Dismiss by SS Life

SS Life moves to dismiss the claims by BMC against it on two grounds. First, SS Life argues that BMC is not a third-party beneficiary of the stop-loss policy between SS Life and General Trading. (ECF no. 63, at 1.) Second, even if BMC is a third-party beneficiary, BMC's claim is time barred by the terms of that policy. (*Id.* at 1–2.)

Under New Jersey law, contract liability to a third party depends on "whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts." *Fackelman v. Lac d'Amiante du Quebec*, 398 N.J. Super. 474, 488 (App. Div. 2008) (quoting *Wermann v.*

*Aratusa, Ltd.*, 266 N.J. Super. 471, 476 (App. Div. 1993)). For contract liability to a third party to exist, a court must find that the parties to the contract intended and contemplated that the contract would benefit a third party. *Id.* (citing *Gold Mills, Inc. v. Orbit Processing Corp.*, 121 N.J. Super. 370, 373 (Law Div. 1972)). Conversely, parties to a contract may expressly negate any legally enforceable right in a third party. *Broadway Maint. Corp. v. Rutgers, State Univ.*, 90 N.J. 253, 260 (1982).

SS Life states that its policy with General Trading explicitly disclaims any enforceable rights on behalf of third parties. It has attached SS Life's policy with General Trading as an exhibit to a certification by Jonathan R. Pepin, an attorney for SS Life.[4] (ECF no. 63, Certification of Jonathan R. Pepin, ex. A). The relevant portions of the policy state:

---

[4]     BMC objects to SS Life's citation to and use of the language of the stop-loss policy. (ECF no. 75, at 8.) It argues that it was not provided a copy of the "purported" stop loss policy until SS Life filed its motion to dismiss. (*Id.* at 9.) It takes issue with the submission of the document (that is, by certification of SS Life's attorney and not by the custodian of records of the company). (*Id.* at 10.) BMC believes, at a minimum, that it should be permitted to conduct discovery so that it can obtain all relevant material and test whether the policy is authentic and complete. (*Id.*)

BMC's claims against SS Life are based entirely on the contract/policy between General Trading and SS Life. (AC ¶¶ 80–86.) While BMC does not expressly quote or cite to the policy in its Amended Complaint, it relies extensively on the existence of provisions that would make SS Life liable to General Trading, with some specificity. (*See, e.g., id.* ¶ 83 ("General Trading contracted with SS Life to provide stop-loss insurance coverage in excess of $50,000 for General Trading's liability to Plan beneficiaries under the Plan. General Trading alleges it paid its $50,000 deductible under the Policy, and so SS Life must reimburse BMC any additional amounts due under the Plan for the emergent medically necessary treatment provided by BMC for Patient 1. BMC is a third-party beneficiary under the stop-loss policy, as SS Life must reimburse General Trading any amounts due and owing to BMC under the Plan in excess of General Trading's $50,000 deductible.").) Because I am allowed to consider "indisputably authentic documents underlying the plaintiff's claims," *Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003), the question turns to whether the attached policy is "indisputably authentic."

BMC has not explicitly alleged that the document is fake or incomplete or pointed to anything within the document that would indicate either. Rather, it objects to the appropriateness of the document's sponsor. (ECF no. 75, at 10.) The policy, as provided by SS Life, bears sufficient indicia to indicate is "indisputably authentic," and I will consider it on this motion to dismiss. In an abundance of caution, I will direct SS

> This Policy does not create any right or legal relationship whatsoever between Us and a Covered Person or beneficiaries under the Plan. We shall not have any responsibility or obligation under this Policy to directly reimburse any Covered Person, or provider of professional or medical services for any benefits which are provided under the terms of the Plan. Our only liability under this Policy is You. Only one of Our officers may change this Policy. No change shall be valid unless the change is agreed to by Our President, Vice President or Secretary in writing. . . . (*Id.* at 7, § 8 (Entire Contract).)

> Except as specifically provided in any rider or endorsement, attached to and forming part of the Policy, We have no obligation to any third party. Our liability under this Policy is limited to reimbursing You, pursuant to the terms of this Policy, for payments You make on behalf of Covered Person for expenses covered under the Plan. You hold Us harmless for damages, of any kind, which are not cause by Our own acts or omissions. We are not responsible for any liability You assume under any contract of agreement other than the Plan. (*Id.* at 8, § 8 (Liability and Indemnification).)

Based on the explicit and unambiguous language of this provision, it was General Trading and SS Life's intent that no party except General Trading would benefit from the stop-loss coverage of the policy. Likewise, the "surrounding facts and circumstance" do not support BMC's argument that it is a third-party beneficiary. (*See* ECF no. 75, at 12.) As to any person covered by the policy, SS Life promised to reimburse losses that exceeded the deductible. (ECF no. 63, at 4, § 3 (Specific Excess Loss Insurance).) This provision, similar to most stop-loss policies, merely provides General Trading with a means to recover excessive losses arising from specific plan beneficiaries and does not function as a guarantee to any particular plan beneficiary.

Because BMC was explicitly not intended to be a third-party beneficiary of the stop-loss policy issued by SS Life, BMC cannot pursue a claim of breach of contract against SS Life. Because BMC cannot pursue a claim as a third-party beneficiary, I need not decide whether BMC's claims against SS Life are

---

Life to file another copy under the certification of a records custodian. Should it fail to do so, I will of course entertain a motion for reconsideration.

time-barred. SS Life's motion to dismiss the claims against it in Count Four is
granted.

### c. Motion to Dismiss by General Trading

General Trading moves to dismiss the claims by BMC against it on
several grounds. First, it argues that BMC lacks standing to pursue the
patient's claims because the patient's assignment of benefits is invalid. (ECF
no. 69, at 1.) Second, General Trading states that BMC's suit is untimely under
the terms of the patient's plan with General Trading. (*Id.* at 1, 8.) Third,
General Trading argues that BMC is not allowed to pursue claims of both
breach of fiduciary duty and denial of a full and fair review under ERISA
because the claims are duplicative. (*Id.* at 1.) Fourth, it asserts that BMC failed
to exhaust its administrative remedies. (*Id.*)

### i. Standing

Health care providers may obtain standing to sue under § 502(a) of
ERISA by assignment from a plan participant. *CardioNet, Inc. v. Cigna Health
Corp.*, 751 F.3d 165, 176 n.10 (3d Cir. 2014) (adopting the majority position of
the other circuits); *see also N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d
369 (3d Cir. 2015) (holding that a valid assignment of benefits by a plan
participant or beneficiary transfers to a health care provider both the insured's
right to payment under a plan and his right to sue for that payment). However,
that assignment from the plan participant to the health care provider must be
valid and enforceable. For example, courts within this district have routinely
declined to enforce assignments where they are contrary to anti-assignment
clauses in plans. *See, e.g., Advanced Orthopedics & Sports Medicine v. Blue
Cross Blue Shield of Ma.*, No. 14-7280, 2015 WL 4430488, at *5–*6 (D.N.J. July
20, 2015) (finding an anti-assignment clause enforceable "on its face" and
noting the weight of authority finding anti-assignment clauses generally
enforceable); *Specialty Surgery of Middletown v. Aetna*, No. 12-4429, 2014 WL
2861311, at *4 (D.N.J. June 24, 2014); *Glen Ridge Surgicenter, LLC v. Horizon
Blue Cross Blue Shield of N.J., Inc.*, No. 08-6160, 2009 WL 3233427, at *4

(D.N.J. Sept. 30, 2009) ("Parties may contractually opt against recognizing an assignment of benefits.").

General Trading's "Plan Document and Summary Plan Description" contains a notice requirement, but not a ban on assignments:

> The **Plan** will pay benefits under this **Plan** to the **employee** unless payment has been assigned to a **hospital**, **physician**, or other provider of service furnishing the services for which benefits are provided herein. No assignment of benefits shall be binding on the **Plan** unless the **claims processer** is notified in writing of such assignment prior to payment hereunder. (ECF no. 69, Declaration of Douglas Boyle, ex. A, at 69 (Assignment).)

The provision clearly contemplates assignments by the employee to a health care provider, provided the claims processer receives notice of such assignment in advance of payment.[5]

In the Amended Complaint, BMC alleges that the patient executed an "Assignment of Benefits" that assigned to BMC "all of [the patient's] rights, benefits, privileges, protections, claims, causes of actions, interest or recovery . . . arising out of any policy of insurance, plan, trust, fund or otherwise providing health coverage of any type to me" and expressly authorized BMC and its affiliates to act as her authorized representative to appeal any adverse benefits determination. (AC ¶¶ 34–35 (quoting from the "Assignment of Benefits").) While BMC contends in general terms that it has a "valid" assignment (AC ¶¶ 34), it does not specifically allege that it gave notice.

I do not think the omission renders the assignment allegation defective. The plan language here does not bespeak any general hostility to patient assignments. In effect, it merely imposes the reasonable procedural requirement that the insured or the provider clearly identify the party to whom

---

[5]   This is not an anti-assignment provision dependent on consent. Compare the provision in *Advanced Orthopedics*, which stated "You cannot assign any benefit or monies . . . to any person, corporation, or other organization without Blue Cross and Blue Shield's written consent" and "[a]ny assignment by [the patient] will be void." 2015 WL 4430488, at *4.

the insurer should send the check. Whether notice occurred seems to be a factual issue dividing the parties, but that issue need not be settled now.[6]

On a motion to dismiss, I must take the complaint's allegations as true and read them in the light most favorable to BMC. I find that BMC has sufficiently alleged a valid assignment from the patient.

### ii. Timeliness

General Trading next asserts that this claim was not brought within the time frame defined by the plan, which sets both a starting date and an ending date for submission of claims. While ERISA does not contain a statute of limitations for claims under § 502(a)(1)(b) and imposes a limitation of six years from the date of breach, violation, or omission, or three years from discovery (whichever is earlier) for breach of fiduciary duty claims under § 502(a)(3), 29 U.S.C. § 1113,[7] plans may set their own limitations on actions. This is because "[t]he plan, in short, is at the center of ERISA" and employers are given leeway

---

[6]    In so holding, I am cognizant of the Third Circuit's recent decision in *American Orthopedics & Sports Medicine v. Independence Blue Cross Blue Shield,* No. 17-1633, 2018 U.S. App. LEXIS 12637 (3d Cir. May 16, 2018). That case, which generally upheld anti-assignment clauses, does not dispose of the issue on this motion as a matter of law. It was mainly concerned with the "statutory gap" left by Congress in ERISA on whether anti-assignment clauses were enforceable. *See id.* at *5–*15. The Court held that Congress's silence on the issue meant that "nothing in ERISA forecloses plan administrators from freely negotiating anti-assignment clauses, among other terms." *Id.* at *13. The clause in that case was a true prohibition on assignments, not a mere notice requirement like the one here. It provided that "[t]he right of a Member to receive benefit payments under this Program is personal to the Member and *is not assignable* in whole or in part to any person, Hospital, or other entity." *Id.* at *3. The appellant in that case also focused on whether the provision was waived under Pennsylvania law. The Court of Appeals found the anti-assignment clause enforceable and held that waiver did not apply. *Id.* at *14–*15, *19 (relying on Pennsylvania waiver law but citing some case law from the District of New Jersey).

[7]    In full, the relevant section of the statute states:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—(1) six years after (A) the date of the last action which constituted part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation. 29 U.S.C. § 1113.

under ERISA to design plans as they see fit. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) (quoting *U.S. Airways, Inc. c. McCutcheon*, 569 U.S. 88, 102 (2013)) ("The principle that contractual limitations provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA plan.").

Here, the limitation period in General Trading's plan applies. "[N]o action at law or in equity shall be brought to recover on the benefits from the ***Plan*** prior to the expiration of sixty (60) days after all information on a claim for benefits have been filed and the appeal process has been completed in accordance with the requirements of the ***Plan***." (ECF no. 69, Declaration of Douglas Boyle, ex. A, at 70 (Legal Action).) Additionally, "[n]o such action shall be brought after the expiration of two (2) years from the date the expense was ***incurred***, or one (1) year from the date a completed claim was filed, whichever occurs first." (*Id.*)

BMC's claim seemingly falls outside of the latest deadline in the plan: "two years from the date the expense was ***incurred***." According to the Amended Complaint, BMC provided the emergency care from November 2, 2013 until November 24, 2013. (AC ¶ 20.) Two years from the latter date would be November 24, 2015. However, BMC did not file its original complaint until August 15, 2017. (*See* ECF no. 1 (Complaint).)

BMC argues for the application of the general New Jersey six-year statute of limitations for breach of contract claims; that is, it says, the most analogous state law statute to be applied when ERISA is silent. (ECF no. 76, at 11 (citing *Mirza v. Ins. Adm'r of America, Inc.*, 800 F.3d 129, 137 (3d Cir. 2014).) BMC acknowledges that the plan here purports to shorten the statute of limitations, but argues that this provision cannot be applied, because the plan administrator failed to "substantially comply" with the notice requirements of 29 C.F.R. § 2560.503(g)(1)(iv) (providing that the plan administrator must "provide a claimant with written or electronic notification of any adverse benefit determination" and that "notification shall set forth . . . (iii) [a] description of

11

the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of [ERISA] following an adverse benefit determination on review."). *See also Mirza*, 800 F.3d at 136 (noting that "the failure to include judicial review time limits in the adverse benefit determination letter renders the letter not in substantial compliance" and explaining that the regulations require that such letters set forth any plan-imposed time limits for seeking judicial review).

For these purposes, I analogize to the standards for evaluating a claim that a complaint must be dismissed as untimely under the statute of limitations. Dismissal is appropriate only if the time bar is apparent from the face of the complaint; otherwise timeliness presents a factual issue. *See Fried v. JP Morgan Chase & Co.,* 850 F.3d 590, 604 (3d Cir. 2017); *Bethel v. Jendoco Const. Corp.,* 570 F.2d 1168, 1174 (3d Cir. 1978).

BMC alleges that General Trading failed to inform it of the contractual limitations provision and the deadline for judicial review. (*See* AC ¶ 72, 76.)[8] General Trading takes issue with that assertion (ECF no. 86, at 6), but as an allegation it is sufficient. For purposes of a motion to dismiss, I must take BMC's allegation as true. On this issue, then, the motion to dismiss is denied.

### iii. Duplicative claims

General Trading argues that BMC cannot pursue both Count Two and Three of the Amended Complaint, because they are duplicative. (ECF no. 69, at 13.)

Section 502(a)(3) is a "catchall" provision, "offering appropriate equitable relief for injuries caused by violations that Section 502 does not elsewhere adequately remedy." *Varety v. Howe,* 516 U.S. 489, 512 (1996). However,

---

[8]    BMC also points to a February 23, 2015 letter attached to General Trading's motion papers where CHP affirmed that BMC's claim "was paid appropriately and no additional shall be made" and notes that that letter does not contain a deadline for filing suit. (ECF no. 76, at 13; ECF no. 69, ex. C (Letter).)

"where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief would not be 'appropriate.'" *Id.* at 515. *Varity* does not, however, impose a prohibition on pleading claims under both § 502(a)(3) and § 501(a)(1)(B). *See, e.g., Lipstein v. United Healthcare Ins. Co.*, No. 11-1185, 2011 WL 5881925, at *3–*4 (D.N.J. Nov. 22, 2011) (denying the motion to dismiss the claims on duplicative grounds as premature but allowing defendants to renew their argument at the motion to dismiss stage); *Chang v. Life Ins. Co. of N. Am.*, No. 08-19, 2008 WL 2478379, at *4 (D.N.J. June 17, 2008) (dismissing, however, plaintiff's claims under both sections since it "would lead to a significant waste of the Court's and the parties' resources).

It may be that § 502(a)(1)(B) suffices to cover all of BMC's alleged grievances and any appropriate relief. Nevertheless, whether the § 503(a)(3) claim is redundant is not clear at this stage, and a party is permitted to plead in the alternative. Fed. R. Civ. P. 8(d). Therefore, I will not dismiss Count Two or Count Three as duplicative.

### iv.  Exhaustion

General Trading argues finally that BMC has not exhausted its administrative remedies. (ECF no. 69, at 15.) "A plaintiff is required to exhaust administrative remedies prior to bringing an ERISA action to recover benefits under a plan." *Mallon v. Trover Solutions, Inc.*, 613 Fed. App'x 142, 143 (3d Cir. 2015) (citing *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 252 (3d Cir. 2002)). BMC argues that is has sufficiently pled futility with respect to exhaustion in its Amended Complaint. (ECF no. 76, at 27.) Specifically, the Complaint alleges that BMC filed appeals with CHP and with Zelis but was told that it was "paid appropriately" and that no further payments would be made. (AC ¶¶ 31–33.) It also alleges that General Trading (through its owner, Douglas Boyle) told BMC that BMC's claim "was properly handled through the proper channels" and that General Trading was not responsible for the remaining balance. (*Id.* ¶¶ 41–43.) Most significantly, the Complaint alleges that BMC was

not given specific reasons for the denial of its claim. (*Id.* ¶¶ 33, 76.) That is a sufficient allegation that BMC has was not required to exhaust any additional administrative remedies before bringing suit. *See Campbell v. Sussex County Fed. Credit Union* 602 Fed. App'x 71, 75 (3d Cir. 2015) (explaining that, according to Department of Labor regulations, when a plan administrator fails to establish or follow claims procedures in denying a claim, such as failing to provide "the specific reason or reason for [the administrator's] denial [of a claim]," a plaintiff is not required to exhaust additional remedies before suit). I will not dismiss BMC's claims on exhaustion grounds.

### d. Motion for Judgment on the Pleadings by Zelis

Two of the Complaint's four counts apply to Zelis (referred to as "PHX" in the complaint). Count Two alleges that Zelis breached its fiduciary duty under the employee welfare benefits plan. (AC ¶¶ 62–73.) Count Three alleges that Zelis denied BMC a full and fair review of the claims made on behalf of the patient, in violation of § 503 of ERISA. (AC ¶¶ 74–79.) Zelis, which has filed an answer, has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

First, Zelis echoes the arguments of General Trading that Patient 1's assignment of benefits to BMC is invalid and that the Count Two and Count Three claims are duplicative. I deny that portion of Zelis's motion for the reasons expressed in Section II.c., *supra*.

Second, Zelis points out that it is not named in the employee welfare benefit plan and that there are no factual allegations in the Amended Complaint that would support an inference that Zelis acted as a fiduciary under the plan. (*Id.* at 1–2.) I will apply the motion to dismiss standard, as Zelis is essentially arguing that BMC has failed to state a claim—that is, that BMC has failed to sufficiently allege that Zelis is a fiduciary. *See Turbe*, 938 F.2d at 428. I therefore look to Zelis's role as alleged in the Amended Complaint and the indisputably authentic documents relied upon by the Complaint.

14

"In every case charging breach of fiduciary duty [under ERISA] . . . the threshold question is not whether the actions of some person employed to provide services under the plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Under ERISA, "an entity is a fiduciary with respect to a plan if it (i) 'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets' or (ii) 'renders investment advice for a fee or other compensation . . . or has any authority or responsibility to do so,' or (iii) 'has discretionary authority or discretionary responsibility in the administration of such plan.'" *National Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 98 (3d Cir. 2012) (quoting 29 U.S.C. § 1002(21)(A)). An entity can be a fiduciary with respect to certain plan activities, but not with respect to others; thus, the threshold question is whether some person or entity was acting as a fiduciary (that is, was performing a fiduciary function) when taking the particular action at issue. *Id.* (citations omitted).

The determination of whether an entity or person performs as a fiduciary is highly fact-based and dependent on the particular tasks they perform. *Neurosurgical Assocs. of N.J., P.C. v. QualCare Inc.*, No. 12-3236, 2015 WL 4569792, at *2 (D.N.J. July 28, 2015). "Thus rulings on this issue have tended to occur after discovery rather than at the pre-discovery motion to dismiss stage." *Id.* (citing *In re Schering-Plough Corp. ERISA Litig.*, No. 03-1204, 2007 WL 2374989, at *7 (D.N.J. Aug. 15, 2007) ("Fiduciary status is a fact sensitive inquiry and courts generally do not dismiss claims at this early stage where the complaint sufficiently pleads defendants' ERISA fiduciary status. . . . [A]t this stage such allegations, unless squarely refuted by Plaintiffs' own pleading or by documents essential to their claims, are sufficient.")).

Zelis argues that the Amended Complaint simply refers to Zelis as a "claims contract negotiator" and that it makes only two factual allegations

concerning Zelis: (1) that BMC received a letter from Zelis on November 26, 2014 concerning whether BMC was appropriately paid; and (2) that on a call with a CIGNA/CHP on February 9, 2015 BMC was told that appeals had to be filed directly with Zelis. (ECF no. 99, at 3–4 (citing AC ¶¶6, 29, 31, 51, 65).) The Complaint's sole allegation that Zelis (PHX) had "discretionary authority or discretionary control" regarding the management and administration of the plan is phrased as a legal conclusion in blanket fashion regarding all defendants. (AC ¶ 68 ("General Trading, Cigna, CHP and [Zelis] exercise discretionary authority or discretionary control relating to the management and/or administration of the Plan, and/or exercise authority and/or control respecting the management and disposition of the Plan's assets.").)

BMC, however, points to several allegations which it believes would support an inference that Zelis has a discretionary role regarding the plan. First, it points to an allegation that it received a January 29, 2014 letter from CHP/CIGNA which contained labels identifying why one of the charges was disallowed, one of those codes representing that "[a] discount was negotiated through [Zelis]."[9] (AC ¶ 28.) Second, it points to the allegations regarding the November 26, 2014 letter from Zelis itself which states that the request for additional payment was forwarded to Zelis for its "review and consideration." (AC ¶ 29.) According to the Complaint, the letter further stated that the charges "were paid in accordance with the Plan and that [Zelis] was further reducing the bill by the outstanding $590,205.72." (*Id.*) BMC, in its briefing, further quotes from the same letter,[10] where Zelis states that "only the Company has

---

[9]    That allegation in full reads:

In an explanation of benefits ("EOB") issued by CHP dated January 29, 2014, CHP provided reason codes and a legend for the disallowed charges, without explaining the bases for the reason codes as applied to BMC's charges related to services provided to [the patient]. The majority of disallowed services used a reason code of "2" for "[a] discount was negotiated through [Zelis]" or "3" for "[e]xceeds reasonable and customary charge." (AC ¶ 28.)

[10]    The letter was provided as an exhibit to a declaration by Paul Doherty (ECF no. 91, ex. A), as part of Zelis's motion. The parties do not dispute the authenticity of the letter (as especially evidenced by BMC's substantial use of the letter in its opposition).

discretionary authority to interpret [the Plan] as it applied to Policy administration." (ECF no. 95, at 13 (quoting from ECF no. 91, Declaration of Paul Doherty, ex. A).) "The Company," however, is never identified in this letter, which does not clearly attribute all discretionary authority to some entity other than Zelis.[11] Finally, the Complaint alleges that a CHP representative advised BMC that "appeals had to be filed directly with [Zelis]." (AC ¶ 31.)

That is enough; as is common, the issue of discretionary authority is a factual one that must await development in discovery. BMC has sufficiently alleged that Zelis exerted discretionary control or authority over the plan sufficient to make it a fiduciary under ERISA. I will thus deny Zelis's motion for judgment on the pleadings.

---

Because the Amended Complaint explicitly relies on this letter in establishing Zelis' involvement with the denial of the payment, I may consider it without converting this to a motion for summary judgment.

[11]   The relevant part of the letter states:

Please note that you are not authorized by contract or by law to define what the Policy Allowance is. Only the Company may define this term and only the Company has the discretionary authority to interpret it as it applies to Policy administration. The Company shall have the exclusive right, power and authority, in their sole and absolute discretion, to administer, apply, interpret and[/]or terminate any provision of the Policy and to decide on all matters arising in connection with the operation or administration of the Policy. The Company has the sole and absolute discretionary authority to take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Policy. All determinations made by the Company with respect to any matter arising under the Policy shall be binding on all parties. (ECF no. 91, Declaration of Paul Doherty, ex. A.)

### III.    Conclusion

For the foregoing reasons, SS Life's motion to dismiss Count Four (Breach of Contract) is GRANTED; General Trading's motion to dismiss Counts One, Two, and Three is DENIED; and Zelis' motion for judgment on the pleadings is DENIED.

An appropriate order follows.

Dated: June 15, 2017

**Kevin McNulty**
**United States District Judge**